In re LABRUM & DOAK, LLP, Debtor.

OFFICIAL COMMITTEE OF UNSE-CURED CREDITORS, on Behalf of the ESTATE OF LABRUM & DOAK, a Pennsylvania General Partnership, Plaintiff,

v.

Karen M. ASHDALE, Perry S. Bechtle, Robert F. Blanck, Michael G. Brennan, John R. Brown, Gerald Bruderele, Jacqueline M. Carolan, R. Michael Carr, Leslie M. Cyr, Zachery R. Estrin, Carl R. Fogelberg, Thomas P. Grace, Jonathan G. Greystone, James O. Hausch, Jonathan Herbst, James D. Hilly, Barbara L. Hollenbach, Mary M. Jacobs, Maureen A. Jordan, Thomas C. Kaczke, Douglas J. Kent, J. Stephen Kreglow, Michael R. Krekstein, John F. Ledwith, John D. Lucey, Jr., Edwin F. McCoy, Kean K. McDonald, William J. McKee, Scott H. Mustin, James M. Neeley, Peter J. Neeson, John H. Osorio, David J. Par-

sells, Jan M. Ritchie, Daniel J. Ryan, John E. Salmon, Paul M. Silver, Stephen J. Springer, Robert J. Stern, Pamela Tobin, Ronald J. Uzdavinis, Patrick R. Vitullo, John L. White, Merle A. Wolfson, Defendants.

Bankruptcy No. 98–10215DAS.
Adversary No. 98–0273.

United States Bankruptcy Court,
E.D. Pennsylvania,
Philadelphia Division.

Dec. 4, 1998.

Neal Colton, Philadelphia, PA, for debtor.

Aris J. Karalis, Philadelphia, PA, for Official Committee of Unsecured Creditors.

Michael P. Zipfel, Rawle & Handerson, LLP, Philadelphia, PA, for Rawle & Henderson.

Robert Szwajkos, Lavin, Coleman, O'Neill, Ricci, Finarelli & Gray, Philadelphia, PA, for Barbara Hollenbach.

Thomas C. Kaczka, Marshall Dennehey Warner Coleman & Goggin, Philadelphia, PA, pro se and for Marshall.

Paul J. Winterhalter, Philadelphia, PA, for Official Former Partners Committee.

Carl R. Fogelberg, Fogelberg & Associates, New York City, pro se.

Frederic Baker, Ass't. U.S. Trustee, Philadelphia, PA, United States Trustee.

## OPINION

DAVID A. SCHOLL, Chief Judge.

### A. INTRODUCTION

Presently before us in the instant bankruptcy case of a dissolved law firm, LABRUM & DOAK, LLP ("the Debtor"), is the disposition of an adversary proceeding ("the Proceeding") instituted by the OFFICIAL COMMITTEE OF UNSECURED CREDITORS ("the Committee"), on behalf of the Debtor, to recover certain post-dissolution income earned by the Debtor's former partners in matters billed on an hourly, non-contingent-fee basis.

Although the original and amended complaints named forty-four (44) alleged former partners as parties, it has been reported that the Proceeding has been dismissed voluntarily or that settlements have been negotiated with all of the defendants except (1) PETER J. NEESON, ESQUIRE, JOHN E. SALMON, ESQUIRE, and STEPHEN J. SPRINGER, ESQUIRE, three very successful former Philadelphia office partners who have become partners of Rawle & Henderson, LLP (collectively, "the Rawle Defendants"); (2) BARBARA L. HOLLENBACH, ESQUIRE, a former Bethlehem office partner who is now a partner of Tallman, Hudders & Sorrentino, P.C.; (3) MICHAEL G. BRENNAN, ESQUIRE, THOMAS C. KACZKA, ESQUIRE, and JOHN H. OSORIO, ESQUIRE, three former New Jersey office partners who are now partners in Marshall, Dennehey, Warner, Coleman & Goggin (collectively, "the Marshall Defendants"); and (4) CARL R. FOGELBERG, ESQUIRE, a former partner located in New York City now doing business there as Fogelberg & Associates, P.C.

The instant disputes with these active defendants ("the Defendants") are perhaps the most unique and controversial of the numerous pieces of litigation arising out of this case. Many arguments are presented in defense, but none have any substantial merit. One of the closer issues is whether the Debtor's partnership agreement controls the allocation of attorneys' fees of the Defendants at the time of dissolution. We agree with the Committee that it does not and that therefore the rights and liabilities of the Defendants are governed by the Pennsylvania Uniform Partnership Act, 15 Pa.C.S. § 8301, *et seq.* ("PAUPA"). We also hold that the Committee is not judicially estopped or precluded, under any application of the doctrine of merger/*res judicata*, from litigating the issues at hand. Consistent with the Commit-

tee's position, and every case from jurisdictions which have addressed the pertinent issues, we conclude that the Debtor's claim for hourly, non-contingent fees derived from pre-dissolution work in progress at time of the Debtor's dissolution is property of its estate which is recoverable by it, even though many of the fees were received after the dissolution. Finally, we hold, again consistent with all known authorities, that the Model Rules of Professional Conduct ("the MRPC") do not preclude a recovery for the Debtor.

However, we also hold that the valuation evidence presented by the Committee's expert was inconsistent with the extant case authority and failed to accurately measure the Debtor's potential recovery from these cases following dissolution. We accept the Committee's limitation of the duration of compensation to one year after the Debtor's dissolution as equitable, given the Debtor's large size and present insolvency. Nevertheless, we hold that this valuation must be determined by reference to the net income generated by only those former cases or matters of the Debtor initiated while they were partners of the Debtor, and only those which were inherited by the Defendants themselves as opposed to colleague associates. Since neither the Committee nor most of the Defendants focused on the proper measurement formula, we will give all interested parties a further opportunity to present evidence of the proper amount due from each Defendant to the Debtor in light of these conclusions at a subsequent hearing of January 6, 1999.

## B. *PROCEDURAL AND FACTUAL HISTORY*

The procedural history of the Debtor's main bankruptcy case and a description of what we then perceived were four significant adversary proceedings initiated in its course are outlined in the first opinion arising out of this case published in the Bankruptcy Reporter, *In re Labrum & Doak, LLP,* 222 B.R. 749, 752–53 (Bankr.E.D.Pa.1998) ("*Labrum IV*"). *Labrum IV* determined that tax recapture liability arising from the Debtor's former Philadelphia office lease must be allocated among its former partners receiving past tax benefits therefrom as well as its partners at dissolution. In decisions published at 226 B.R. 161 ("*Labrum VI*"), supplementing 225 B.R. 93 ("*Labrum V*") (Bankr. E.D.Pa.1998), we held that the Debtor was entitled to certain *quantum meruit* fees from former attorneys who completed its contingency-fee cases after dissolution. In an opinion now reported only at 227 B.R. 372 (Bankr.E.D.Pa.1998) ("*Labrum VII*") we approved most aspects of the Committee's Chapter 11 plan. That plan was ultimately confirmed in a slightly-amended form on December 2, 1998. Finally, we dismissed a proceeding brought by the Official Committee of Former Partners ("the FP Committee"), joined by the instant Committee, which sought to recover certain 1997 pre-dissolution distributions to certain partners pursuant to 11 U.S.C. §§ 547(b) and 548(b) in an opinion now reported only at 227 B.R. 383 (Bankr. E.D.Pa.1998) ("*Labrum VIII*").

The instant Proceeding appears somewhat similar to the proceeding addressed in *Labrum V* and *Labrum VI*, although it seeks a recovery from only partners in non-contingency fee cases and matters previously handled by the Defendants for the Debtor at the time of its dissolution under a partnership-law theory. The proceeding decided in *Labrum V* and *Labrum VI* sought a recovery from non-partners who inherited contingency-fee cases previously handled by those defendants for the Debtors on a *quantum meruit* basis.

A comprehensive history of the case can be gleaned from examining all of the foregoing opinions. For purposes of the Proceeding before us, we note that the Debtor was a law partnership which was engaged in practice for ninety-three years. On June 5, 1997, the Debtor's remaining partners, largely in response to advice from the "rainmaking" Rawle Defendants that they planned to depart, voted to dissolve the firm effective July 31, 1997, and on the latter date the firm ceased its practice. This case was filed as an involuntary bankruptcy petition under Chapter 7 of the Bankruptcy Code on January 6, 1998, by six former partners, named in *Labrum III*, 222 B.R. at 752, and was converted

by the Debtor to a Chapter 11 case on January 22, 1998. On February 11, 1998, the office of the United States Trustee appointed the Committee, which has been an active player in most of the litigation in the case and plans to continue in this role even after confirmation. *See Labrum VII,* 227 B.R. at 375, 378–379, 380.

The genesis for the instant Proceeding was a motion filed on April 28, 1998, by the law firm of Ryan, Brown, McDonnell, Berger and Gibbons and several partners of that firm (collectively "the Ryan Firm"), the only parties contesting the contingency-fee proceeding to its end, requesting permission to file a complaint seeking an accounting and a return of income earned subsequent to the dissolution of the Debtor by its former partners in matters billed on an hourly-fee basis. The motivation for this motion was apparently the Ryan Firm's perception that the Rawle Defendants had been in control of the Debtor and would refrain from pursuing a cause of action in which they were the major defendants. After an extensive hearing followed by briefing we filed a decision, reported as *In re LaBrum & Doak, LLP,* 1998 WL 246530 (Bankr.E.D.Pa. May 14, 1998) (*"LaBrum I "*). Therein, we denied the participation of the Ryan Firm or its chosen advocate in any such proceedings, on the grounds that the retaliatory aspects of the motion might deem their active presence counter-productive. However, we also held that the Committee, which was perceived as neutral on the intra-partner disputes, should file what ultimately became the instant Proceeding, if it deemed same appropriate to prosecute, by May 22, 1998.

The Committee followed up its original filing on May 22, 1998, by presenting an Amended Complaint ("the Complaint") on May 29, 1998. The Complaint is in four counts, entitled, respectively, Claim for Declaratory Relief (that the Debtor has an interest in the hourly-fee cases or matters), Permanent Injunction (to prevent transfer or disposal of such fees), Quantum Meruit (seeking proceeds generated from the cases or matters on that basis), and Claim for an Accounting (of the fees received).

On June 26, 1998, the Debtor (though not apparently a party with standing to do so) and eighteen (18) of the original forty-four (44) defendants moved to dismiss the Complaint. These motions were denied in an Order/Memorandum reported as *In re LaBrum & Doak, LLP,* 1998 WL 404301 (Bankr. E.D.Pa. July 15, 1998) (*"LaBrum II "*), on July 15, 1998. Shortly thereafter, disputes regarding discovery requests for compensation formulae utilized by the defendants' new firms arose between the Committee and certain of these firms who deemed such information confidential, notably the firms of the Marshall Defendants, the Rawle Defendants, and Hollenbach. In response to the various objections and/or motions to quash subpoenas filed by the objecting firms, and the Committee's motion to compel discovery and production of documents, we entered an Order/Memorandum reported as *In re LaBrum & Doak,* 1998 WL 465893 (Bankr.E.D.Pa. July 27, 1998) (*"LaBrum III "*), directing all firms so requested to respond to the Committee's discovery and document production requests by August 3, 1998, but providing that certain of the information be deemed confidential. On August 5, 1998, we granted the Committee's motion for a second continuance of the trial from August 12, 1998, in light of the discovery delays effected by these disputes, and rescheduled the trial of the Proceeding for September 9, 1998.

A four-day trial of the Proceeding was conducted between September 9, 1998, and September 17, 1998. Voluntary dismissals of twenty-three (23) of the defendants were approved by an order of September 25, 1998, and settlements were reported with nine (9) more prior to trial. Agreed dismissals subsequent to trial have apparently reduced the Defendants to eight (8) parties, one of which, Defendant BRENNAN, has filed his own personal bankruptcy in New Jersey. At least five other partners, although no others among the Defendants, have filed personal bankruptcies in this court.

As witnesses at trial, the Committee called all of the Defendants; J. Stephen Kreglow, a former partner of the Debtor who it apparently ultimately agreed to dismiss; and George L. Miller, an accountant, as its sole

expert witness. The Rawle Defendants called Joel Rose, a law firm management consultant and co-chair of the law practice management section of the American Bar Association; John Heck, their present firm's accountant; Karen Ashdale, a former non-equity partner and a dismissed defendant whose name nevertheless remains attached to the case as the original lead defendant; and Alan Epstein, Esquire, a well-known Philadelphia attorney, as an expert in the field of professional responsibility. Hollenbach briefly recalled Epstein. The Marshall Defendants called Richard Barry Strosnider, Esquire, an eminent New Jersey practitioner, as their expert witness with respect to professional liability. Fogelberg offered brief, hostile testimony *pro se.*

The Committee's case featured lists, charts, transcripts, affidavits, and formulae illustrating the number of hourly-fee case files serviced by the Debtor and transferred to the Defendants at or prior to its dissolution, as well as the foregoing testimony. Several portions of the transcript and exhibits were deemed confidential in nature and were heard in a cleared courtroom. The exhibits and transcripts consequently contain certain sealed portions. After the completion of the trial, the parties agreed that the Committee's opening brief would be submitted by October 16, 1998, and that the Defendants so desiring would file their opposing briefs by November 6, 1998. The Rawle Defendants, Hollenbach, Kaczka, apparently on behalf of the Marshall Defendants, filed briefs, in descending order as to length and complexity. Fogelberg submitted an Affidavit which was part argument and part improper attempt to embellish the record as to him. *But see In re MacDonald,* 222 B.R. 69, 72 (Bankr.E.D.Pa.1998); and *In re Cook,* 146 B.R. 934, 939 (Bankr.E.D.Pa.1992) (party *pro se* or by counsel cannot supplement a record by post-trial submissions).

The Committee argued that the Amended Restated Partnership Agreement for the Firm of Labrum and Doak ("the PA"), did not address the allocation of its departing attorneys' fees from its cases between the partners and the Debtor itself upon dissolution, thereby rendering the provisions of

PAUPA controlling. Consequently, the Committee applied PAUPA and contended that it required the Debtors's partners to wind up the "unfinished business" of the dissolved partnership with no additional compensation, thus rendering the proceeds from the Debtor's hourly-fee cases pending at the time of dissolution property of the Debtor's estate. It then argued that a formula for valuing that portion of the Debtor's "book of business" taken by each of the Defendants, based on the "income approach" of same as calculated by Miller for the period of one year after dissolution, was the proper measure of that value. Finally, it argued that the MRPC did not bar its recovery.

The Rawle Defendants countered by arguing first that the provisions of the PA addressing transfers of cases by withdrawing partners, which basically released them from accountability to the Debtor for future services on hourly-fee cases, should control. Second, they presented elaborate estoppel and *res judicata* arguments arising from the fact that the Debtor, in litigating *Labrum V* and *Labrum VI,* had allegedly not pursued post-dissolution services, as did the Committee here. Third, they discuss at length a group of non-law-partnership cases, predominantly *George v. Richards,* 361 Pa. 278, 64 A.2d 811 (1949), as well as citing some Chapter 7 cases involving lawyers, notably *Turner v. Avery,* 947 F.2d 772 (5th Cir.1991); and *In re Tonry,* 724 F.2d 467 (5th Cir.1984), in support of a contention that the fees from these cases or matters are not property of the Debtor's estate. Finally, they devote considerable attention to policy arguments that a decision in favor of the Committee would have a serious prejudicial impact upon the attorney-client relationships and the ability of attorneys to transfer to different firms.

Hollenbach argued as follows: (1) the Debtor had no property interest in the fees generated from the hourly-fee cases transferred at the time of dissolution; (2) she did not violate any contractual obligations contained in the Debtor's PA nor did she breach any fiduciary duties, but rather she diligently worked to collect fees and assist with administrative problems of the Debtor; (3) the valuation "formula" presented by the Com-

mittee was baseless and contrived, and includes cases and matters of associates and which had been transferred to the Debtor from her prior firm; and (4) MRPC 1.5(e), 1.8(j), and 5.6 precluded a recovery for the Committee.

Kaczka initially contended that he was not a real "equity partner" of the Debtor. Next, apparently on behalf of all of the Marshall Defendants, he disputed the valuations of the Committee's expert, particularly as it created a large liability of those Defendants relative to their alleged lower standing in the firm than the Rawle Defendants. Finally, he argued that the Committee's claims, if sustained, would result in a violation of MRPC 5.4 and 5.6, particularly as applied in New Jersey in *Jacob v. Norris, McLaughlin & Marcus,* 128 N.J. 10, 607 A.2d 142 (1992); and *Leonard & Butler, P.C. v. Harris,* 279 N.J.Super. 659, 653 A.2d 1193 (1995), *cert. denied,* 141 N.J. 98, 660 A.2d 1196 (1995).

Fogelberg briefly disputed the accuracy of the records supplied in discovery to the Committee by his own computerized billing program and echoed arguments of the other Defendants regarding his lack of fiduciary obligations to the Debtor and alleged MRPC principles contrary to the relief sought.

## C. *DISCUSSION*

1. *The PA Does Not Control the Allocation of Attorneys' Fees Among the Debtor and Its Former Partners upon Dissolution, and Therefore the Liabilities of the Defendants Are Governed by PAUPA.*

The first important issue is whether the Debtor's PA controls the allocation of attorneys' fees for pending hourly-fee cases at the time of dissolution. The determination of this issue requires interpretation of sections 17.1, 19.8.1, and 19.8.2 of the PA, which read as follows:

### ARTICLE XVII

### *DISSOLUTION*

**17.1** The partnership will continue in existence until a majority of partners decide otherwise at a meeting, .... If dissolution is voted at such a meeting by such a majority vote, a majority of the partners shall, at the same meeting, designate one or more of the partners as Liquidating Partners, who shall have full power and authority to determine the method and timing of the dissolution and liquidation of the firm, and their decisions on all matters related to the liquidation and the method of accomplishing the same shall be binding on all partners.... The costs of dissolution and liquidation shall include reasonable compensation for the Liquidating Partners and for lawyers (including other partners if so selected by the Liquidating Partners) and such other professional, stenographic, clerical and other assistants as the Liquidating Partners may require in order to carry out their plan of liquidation.... After payment of all costs of the liquidation, the net assets and the proceeds of the liquidation shall be applied as follows:

(a) payment of the liabilities and debts of the partnership to creditors other than the partners;

(b) payment of unmatured installments yet to be paid on account of prior death, termination, disability, withdrawal, or retirement of partners;

(c) payment of debts and liabilities owing to the partners including salaries accrued but unpaid at the time liquidation was voted, but excluding capital and undistributed profits;

(d) repayment of partners' capital contributions and undistributed profits; and,

(e) payment of the balance of the assets and proceeds, to be distributed, at the time or times and in the manner specified by the Liquidating Partners, among those partners who were partners on the date liquidation was voted, in the same proportion as their respective Partnership Points in the firm as of that date....

### ARTICLE XIX

### *ADDITIONAL PROVISIONS*

. . .

### 19.8 TRANSFER OF CASES AND MATTERS

. . .

19.8.1 All partners agree that in the event of the death, withdrawal, retirement, disability or expulsion of any of them, all matters and cases (collectively "files") in the hands of the partnership on the date of said event shall remain with the partnership unless the client gives the partnership specific written instructions to the contrary. If any client issues written instructions that any file is to be removed from the hands of the partnership and turned over to the representatives of the deceased partner or to the withdrawing, retired, disabled or expelled partner, there shall be paid to the firm by such client or by such former partner or his or her estate, before the file is so transferred, the following fees and costs with respect to such file, as determined by the Executive Committee, and the partnership shall have a lien on and retain possession of all papers, documents and material in every such file until full payment of all such fees and costs is made:

(a) all issued and outstanding billings by the firm for fees and for reimbursement of costs and out-of-pocket disbursements; and

(b) All of the firm's accrued and unbilled costs and out-of-pocket disbursements, including those costs incurred or disbursed in connection with the review, billing, and transfer of the file; and,

(c) One hundred percent (100%) of the firm's accrued and unbilled time charges for attorneys, paralegals, law clerks and administrative personnel, computed at the standard hourly rates maintained for such personnel at the times such charges were incurred, including time charges incurred in connection with the review, billing and transfer of the file.

19.8.2 Each of the partners acknowledges and agrees that the amounts payable to the firm pursuant to Section 19.8.1, including but not limited to the amounts payable pursuant to Section 19.8.1(c), are in lieu of the firm's maintaining any continuing financial interest in the outcome or future fees of the case or matter which in [sic] the subject of a transferred file, and that such amounts are intended to fairly compensate the firm for its services in connection with such file and are not to be construed an [sic] a penalty.

. . .

The Committee argued that the PA does not control the allocation of attorneys' fees for pending hourly-fee cases upon dissolution. In support of this argument, the Committee pointed out that, although the PA identifies how to handle the allocation of fees in the context of death, withdrawal, retirement, disability, or expulsion of a particular partner, the PA is silent as to the allocation of attorneys' fees in the event of dissolution. As can be seen, ¶ 17.1 addresses principally the issue of the priorities of the payment of the Debtor's creditors. Since the PA is silent on this critical subject of attorney fee allocation upon dissolution, the Committee concluded that the provisions of PAUPA, specifically 15 Pa. C.S. §§ 8301–8365, apply, citing *Girard Bank v. Haley*, 460 Pa. at 237, 242, 332 A.2d 443, 446 (1975) ("Where [a] partnership is dissolved . . . and [its] partnership agreement is silent as to the winding up and liquidation, [the] provision[s] of [the] Uniform Partnership Act control").

The Rawle Defendants, joined by Hollenbach, asserted, to the contrary, that § 19.8.1 of the PA controls the allocation of attorneys' fees at the time of dissolution and therefore the theory of liability set forth in PAUPA and such cases interpreting partnership law in this context, *e.g., Jewel v. Boxer*, 156 Cal. App.3d 171, 203 Cal.Rptr. 13 (1984), do not apply. The Rawle Defendants objected to the Committee's reading §§ 17.1 and 19.8.1 of the PA as separate, mutually-exclusive clauses, and argued that these provisions must be read in conjunction with each other. In making this argument, the Rawle Defendants relied on *Western United Life Assurance Co. v. Hayden*, 64 F.3d 833, 837 (3d Cir.1995) ("when interpreting a contract a court must determine the intent of the parties and effect must be given to all provisions in the contract") and, *M. Barry Schultz & Co. v. APM Horsham, Inc.*, 835 F.Supp. 820, 822 (E.D.Pa.1993) ("a court must attempt to

give meaning to every provision of a contract and should construe provisions as compatible whenever possible").

The Rawle Defendants allowed that the Committee was justified in arguing that the PA is ambiguous, but they argued that the ambiguity must be construed against the Debtor which is purportedly its draftsperson. While stating, without support in the record, that the actual draftspersons cannot be identified, they point out that they were not those persons.

Hollenbach, making a similar argument, asserted that §§ 19.8.1, 19.8.1(c), and 19.8.2 of the PA control the allocation of attorneys' fees at the time of dissolution. To support this argument, she relied exclusively on the language of the PA, contending that, since §§ 17.1 and 19.8.1 are not inconsistent with each other, the latter should be read into the former. Further, Hollenbach argued vigorously that she did not violate or breach her contractual and/or fiduciary duties to the Debtor. In making this argument, Hollenbach pointed to the facts that she (1) provided extensive services to the Debtor during its dissolution process; (2) continued to provide hourly-fee services, "free of charge," for all open matters and cases until July 31, 1997; (3) handled all of the invoicing and collection of hourly-fee cases with a 99% collection rate success; (4) resolved the Debtor's Bethlehem office lease dispute with a former partner; and (5) resolved the Debtor's 401(k) Plan matters.

■ We nevertheless continue to believe, as we expressed in *LaBrum II*, that the Committee's position with respect to the inapplicability of the Debtor's PA appears correct. The PA is a contract and must be interpreted according to Pennsylvania law of contracts. *See Labrum IV*, 222 B.R. at 756. It is well settled under the laws of this Commonwealth that, when interpreting a contract, a court must determine the intent of the parties and effect must be given to all provisions in the contract. *Western, supra*, 64 F.3d at 837; and *Z & L Lumber Co. of Atlasburg v. Nordquist*, 348 Pa.Super. 580, 585, 502 A.2d 697, 699 (1985). It is also well established that the strongest external sign of agreement between contracting parties is the words they use in their written contract. *Mellon Bank, N.A. v. Aetna Business Credit, Inc.*, 619 F.2d 1001, 1009 (3d Cir.1980). Thus, the sanctity of the written words of the contract is embedded in the law of contract interpretation.

■ As many cases illustrate, if a written contract is clear and unambiguous, the court must construe the contract as a matter of law by its contents alone. *Allegheny Int'l, Inc. v. Allegheny Ludlum Steel Corp.*, 40 F.3d 1416, 1424 (3d Cir.1994). *See also Mellon Bank, supra*, 619 F.2d at 1013 ("[I]f [the parties] intent can be clearly extracted from the clear and unambiguous words that [they] have used, it is equally conventional wisdom that they are held to those words contained in the contract"). Only if the contract is ambiguous may a court, in order to ascertain the intention of the parties, consider the surrounding circumstances, the situation of the parties, the objects they apparently have in view, and the nature of the subject matter of the agreement. *Western, supra*, 64 F.3d at 837. Whether a contract is in fact ambiguous is a threshold question of law.

■ The language of the instant PA is neither susceptible to different constructions nor capable of being understood in more senses than one. On the contrary, the agreement clearly and unambiguously provides for the allocation of fees and costs in only five specific instances. Dissolution is not one of them. As we noted at *LaBrum II*, at *5:

§§ 17.1 and 19.8 [of the PA] do not cross-reference each other. § 17.1 addresses dissolution, but does not incorporate § 19.8. Meanwhile, § 19.8 addresses transfers of matters and cases, but expressly applies only to death, withdrawal, retirement, disability, or expulsion of an individual partner. Dissolution of the entire partnership entity appears to be an event sufficiently distinct from the rather complete list of events which could lead to departure of a partner and are controlled by § 19.8, as to . . . justify different procedural treatment.

Thus, we find that a natural construction of the PA indicates that § 19.8.1 does not control the allocation of attorneys' fees of the Debtor at the time of its dissolution. Ac-

cordingly, the rights and liabilities of the active defendants are therefore governed by PAUPA, 15 Pa.C.S.A. § 8301–8365, not by the PA.

> 2. *The Committee Is Not Judicially Estopped or Precluded by Res Judicata Arising from the Actions and Arguments by a Different Party (the Debtor itself) in a Different Case (the Contingent Fee Proceeding).*

The Rawle Defendants claim that it would be unfair and improper to allow the Committee to recover "profits" generated from post-dissolution work on hourly-fee cases, when the Debtor allegedly failed to pursue a similar claim for post-dissolution work in the contingent fee dispute litigated in *Labrum V* and *Labrum VI*. More specifically, the Rawle defendants maintain that the Committee is judicially estopped from pursuing the allegedly broader claim at hand because the Debtor allegedly sought narrower relief in *Labrum V* and *Labrum VI*. In further support of this argument, the Rawle Defendants observe that, in the contingent fee dispute, the Debtor abandoned the partnership law principles set forth in, *e.g.*, *Jewel, supra*, and limited its claim to compensation for pre-dissolution work actually performed on certain contingent-fee cases on a *quantum meruit* basis. *See Labrum V*, 225 B.R. at 103.

The Rawle Defendants further continued that the Committee's claim is barred by the merger doctrine type of *res judicata*. In making this argument, the Rawle Defendants rely on several court decisions stating that the merger doctrine precludes parties from relitigating claims that were litigated, or could have been litigated, in a prior proceeding, *e.g.*, *Swineford v. Snyder County, Pa.*, 15 F.3d 1258 (3d Cir.1994); *Guarino v. Larsen*, 11 F.3d 1151 (3d Cir.1993); *Tice v. American Airlines, Inc.*, 959 F.Supp. 928 (N.D.Ill.1997); *First Options of Chicago, Inc. v. Kaplan*, 913 F.Supp. 377 (E.D.Pa.1996); and *Krall v. Commonwealth of Pa.*, 903 F.Supp. 858 (E.D.Pa.1995).

■ We find no merit whatsoever in these arguments. Judicial estoppel, sometimes called the "doctrine of preclusion of inconsistent positions," is a judge-made doctrine that seeks to prevent a litigant from asserting a position inconsistent with one that the same party has previously asserted in the same or in a previous proceeding. *See McCarron v. F.D.I.C.*, 111 F.3d 1089, 1097 (3d Cir.1997); *Ryan Operations G.P. v. Santiam–Midwest Lumber Co.*, 81 F.3d 355, 358 (3d Cir.1996); *Scarano v. Central R.R.*, 203 F.2d 510, 513 (3d Cir.1953); *Labrum VI*, 226 B.R. at 165–66; and *LaBrum II*, at *3 (rejecting a claim by the Committee that Defendant Neeson, in supporting the Debtor's argument that *Jewel* applied in the contingent-fee cases, was estopped from denying its application in this Proceeding, an argument which the Committee has wisely abandoned). It is not intended to eliminate all inconsistencies, however slight or inadvertent, by different parties in different contents. Under the law of this Circuit, the application of judicial estoppel is determined by a two-part inquiry: (1) is the party's present position inconsistent with one previously asserted in a judicial proceeding? and (2) if so, did the party assert either or both of the inconsistent positions in bad faith?—i.e., "with intent to play fast and loose with court?" *Ryan Operations, supra*, 81 F.3d at 361. *Accord, Daliessio v. Depuy, Inc.*, 1998 WL 24330, at *6 (E.D.Pa. Jan. 23, 1998); and *Labrum VI*, 226 B.R. at 165.

■ We find that neither prong of this inquiry applies here. First, the Committee was not an active party in the contingent-fee case. It had no apparent control over the Debtor's arguments or presentation of evidence in that proceeding. Second, that proceeding was ultimately litigated against parties who were not partners of the Debtor. *See Labrum V*, 225 B.R. at 103–04. Therefore, an argument based on PAUPA and *Jewel* and their progeny was not possible in that case, as it is here. Finally, it is clear to us that the Debtor *was* pursuing the Ryan Firm defendants for post-dissolution work on contingent-fee cases at the Ryan Firm in *Labrum V* and *Labrum VI*. Like here, the issue was whether the Debtor had a right to the fruits of such work because the cases at issue *began* pre-petition. The result in *Labrum V* and *Labrum VI* that the Debtor had such rights was totally consistent with the result sought by the Committee here.

Finally assuming *arguendo* that the Committee's position were deemed sufficiently inconsistent with that of the Debtor in the contingent-fee dispute, it is clear that asserting inconsistent positions does not trigger the application of judicial estoppel unless "intentional self contradiction is . . . used as a means of obtaining unfair advantage." *Scarano, supra*, 203 F.2d at 513. Thus, the doctrine does not apply "when the prior position was taken because of a good faith mistake rather than as a part of a scheme to mislead the court." *Konstantinidis v. Chen*, 626 F.2d 933, 939 (D.C.Cir.1980). An inconsistent argument sufficient to invoke judicial estoppel must be attributable to intentional wrongdoing. *See Chaveriat v. Williams Pipe Line Co.*, 11 F.3d 1420, 1428 (7th Cir. 1993) ("Judicial estoppel is strong medicine, and this has led courts and commentators to characterize the grounds for its invocation in terms redolent of intentional wrongdoing."); *Total Petroleum, Inc. v. Davis*, 822 F.2d 734, 738 (8th Cir.1987) ("The doctrine [of judicial estoppel] only applies to deliberate inconsistencies that are tantamount to a knowing misrepresentation to or even fraud on the court."). *See also Labrum VI*, 226 B.R. at 165–66. Accordingly, not every inconsistent position gives rise to judicial estoppel and, indeed, it is well settled in this Circuit that evidence of bad faith is required. *Koppers Co. v. Certain Underwriters at Lloyd's of London*, 993 F.Supp. 358, 362 (1998).

In the instant proceeding, the Rawle Defendants have produced no evidence tending to establish that the Committee's present position was asserted in bad faith, *i.e.*, with an intention "to play fast and loose with the court." In addition, the conceptual and factual differences between the contingent fee matter and the instant Proceeding illustrate that taking one position in the one case and a different position in the other is in no sense a manifestation of playing "fast and loose" with this court. In the contingent fee matter, the Debtor abandoned the theory espoused by *Jewel*, relying instead on a *quantum meruit* theory of recovery. *See Labrum V*, 225 B.R. at 103–04. Here, rather than pursuing a *quantum merit* theory, the Committee's case is based solely on partnership law principles. However, these inconsistencies are not the result of any intentional wrongdoing or bad faith on the part of the Committee. On the contrary, since the partnership law theory can apply only to partners of a dissolved law firm, the Debtor in the prior proceeding had no choice but to abandon the theory espoused by *Jewel*. Here, on the other hand, since all the active defendants are former partners of the debtor, the Committee may properly rely on partnership law theory.

Accordingly, we find that the Committee in no sense changed its legal theory to "gain an unfair advantage" in this Proceeding. Rather, the Committee took a position which had merit in this context, but had no merit in the contingent-fee context. Therefore, we find with little difficulty that the doctrine of judicial estoppel is inapplicable here.

The doctrine of merger is a "subset" of *res judicata, In re Laubach*, 77 B.R. 483, 484 (Bankr.E.D.Pa.1987), which operates to preclude a claim where there is a concurrence of the following conditions:

"(1) a final judgment on the merits in a prior suit involving (2) the same parties or their privies and (3) a subsequent suit based on the same cause of action." *Id.*, quoting *United States v. Athlone Industries, Inc.*, 746 F.2d 977, 983 (3d Cir.1984).

We noted in *In re Main, Inc.*, 1998 WL 156684, at *2–*3 (Bankr.E.D.Pa. March 31, 1998), that the doctrine of merger is riddled with exceptions. We also noted there that one of the most difficult questions in applying merger is establishing that there is a single "claim" for purposes of application of the doctrine. Among the considerations suggested by the RESTATEMENT (SECOND) OF THE LAW OF JUDGMENTS, § 24(2), at 196 (1982), quoted in *Main, supra*, at *3, for determining the issue of whether the "claim" is in fact identical with one at issue in an earlier suit are whether

the facts are related in time, space, origin, or motivation, whether they form a convenient trial unit, and whether their treatment as a unit confirms to the parties' expectations or business understanding or usage.

■ The contingent-fee and hourly-fee claims of the Debtor were split from the time that the Debtor itself chose to vigorously pursue the former, but initially refused and only half-heartedly ultimately agreed to prosecute the latter, which caused us to designate the Committee as the party to pursue same in *LaBrum I*. As mentioned above, the Committee had virtually no role in these decisions of the Debtor or in its prosecution of *Labrum V* and *Labrum VI*. It is therefore clear to us that these different fee claims have never been conceived of as a unit by the Debtor or by the Committee. No party except the Ryan Firm has, prior to the Rawle Defendants' expression in their brief, ever indicated an expectation or understanding that these claims should be tried together. Moreover, this court refused to sustain the argument of the Ryan Firm that these claims must or should be tried together.

Nor are the facts supporting these claims related in time, space, origin, or motivation. No defendant who litigated the contingent-fee case was active in the litigation of the Proceeding, and vice-versa. It is true that Defendant Springer had some contingent-fee cases, the disposition of the fees in which he settled by agreeing to the Debtor's formula. However, we believe that this was the only overlap in the handling of the different types of cases involved in each of the proceedings. We also note that Springer's settlement of the contingent-fee claims against him was well-advised, or he would have been liable for proceeds generated by these cases as well. A proper application of the doctrine of merger bars any further recovery against him for contingent-fee cases, but those cases only. The parties to the two proceedings are therefore for the most part not the same, nor are they for the most part in privity with parties in the other proceeding.

Moreover, as we noted in our discussion of judicial estoppel at page 403 *supra,* the legal theories ultimately applied to each type of claim simply could not be applied to the other. The partnership-law theories which drive the instant Proceeding could not have been applied to the claims against non-partners of the Debtor litigated in *Labrum V* and *Labrum VI*. The *quantum meruit* claims which succeeded in part there probably could not have been applied here. Thus, the claims were very different in the Proceeding at bar from those asserted in *Labrum V* and *Labrum VI.*

The Pennsylvania Supreme Court, in *Haefele v. Davis,* 399 Pa. 504, 508, 160 A.2d 711, 713 (1960), cautioned that

[t]he conclusive effect of a judicial decision cannot be extended by argument or implication to matters not actually heard and determined nor to collateral questions which arise but do not become part of the case.... "[A] former judgment is not conclusive of anything which was not directly decided by it or was not material to the decision. Before such effect can be given to it in another suit, it should appear from the record, or aliunde, that it must have rested on the precise question which [is] sought again to agitate." *See also, Morgan Guar. Trust Co. v. Staats,* 428 Pa.Super. 479, 631 A.2d 631, 633 (1993).

The issues at bar were neither heard nor determined in the prior proceeding, and the parties are in no sense identical. Therefore, by no stretch can the doctrine of *res judicata* be applied here.

3. *The Fees Derived from Work–In–Progress at the Time of the Debtor's Dissolution in Hourly, Non–Contingent–Fee Cases or Matters Are Indeed Property of Its Estate Which Are Recoverable by the Committee.*

Having disposed of the judicial estoppel and *res judicata* arguments raised by the Rawle Defendants and having determined that the Committee's rights are controlled by PAUPA, we turn to the critical substantive issues of whether the Committee has in fact asserted valid claims on behalf of the Debtor's estate. The determination of these issues requires the application of several principles of general partnership law and of the Bankruptcy Code, relating to property of a debtor's estate. We begin by reference to 11 U.S.C. § 541(a)(1) of the Code, which reads as follows:

**§ 541. Property of the estate**

(a) The commencement of a case under section 301, 302, or 303 of this title cre-

ates an estate. Such estate is comprised of all the following property, wherever located and by whomever held:

> (1) Except as provided in subsections (b) and (c)(2) of this section, all legal or equitable interests of the debtor in property as of the commencement of the case.
>
> . . .

The Committee argues that, absent a contrary agreement, the Defendants have a duty to wind up the firm's "unfinished business" because they continue to owe fiduciary duties to the Debtor throughout its winding up process. In support of this argument, the Committee asserts that a partnership does not terminate on dissolution, but continues to exist until the winding up of partnership affairs is completed. *See* PAUPA, 15 Pa.C.S. § 8352. The Committee further asserts that, after dissolution, the partners of a dissolved law firm continue to owe fiduciary duties to one another to wind up the "unfinished business" of the firm without any additional compensation for this activity. *See* PAUPA, 15 Pa.C.S. §§ 8331(6), 8352. *See e.g., Resnick v. Kaplan,* 49 Md.App. 499, 508, 434 A.2d 582, 587 ("'a law partner in dissolution owes a duty to his old firm to wind up its affairs, . . . and . . . upon a dissolution any of the partners is obligated to complete the obligation without extra compensation,'" quoting *Frates v. Nichols,* 167 So.2d 77, 80–81 (Fla. App.1964)). *See also Jewel, supra,* 156 Cal. App.3d. at 176, 203 Cal.Rptr. at 15 ("Under the Uniform Partnership Act, a dissolved partnership continues until the winding up of unfinished partnership business . . . [n]o partner is entitled to extra compensation for services rendered in completing unfinished business.").

Next, the Committee maintains that the hourly-fee cases pending at the time of dissolution constitute the Debtor's "unfinished business." In support thereof, the Committee observes that cases in progress at the time of dissolution are the "unfinished business" of the former firm and the fees derived from such cases must be shared by the former partners. *See Sufrin v. Hosier,* 896 F.Supp. 766, 769 (N.D.Ill.1995) ("'we conclude that the work in progress should be considered unfinished business and the fees derived from such work should be divided on the basis of a [*Jewel*] formula, which is to say, a UPA formula,'" quoting *Fox v. Abrams,* 163 Cal.App.3d 610, 617, 210 Cal. Rptr. 260, 266 (1985)); and *Rothman v.. Dolin,* 20 Cal.App.4th 755, 759, 24 Cal.Rptr.2d at 571, 573 (1993) ("[W]e hold that unfinished business simply consists of all matters in progress which have not been completed at the time the firm is dissolved . . . [t]hat one matter is to be compensated at an hourly rate and another on a contingency basis is of no consequence in determining whether a matter is unfinished business"). *See also, Jewel, supra,* 156 Cal.App.3d at 177, 203 Cal.Rptr. at 16 ("income received by the former partners from cases unfinished at the time of dissolution is to be allocated on the basis of the partners' respective interests in the dissolved partnership").

The Committee also notes that a law firm's work-in-progress at the time of its dissolution is an asset of the firm. *See Sullivan, supra,* 16 Kan.App.2d 208, 212, 820 P.2d 1248, 1251 (1991) ("'work in progress at the time of dissolution is an asset of the dissolved firm and the partners have an obligation to complete the work in progress,'" quoting *Marr v. Langhoff,* 322 Md. 657, 667–68, 589 A.2d 470, 476 (1991)). As such, it belongs to the bankruptcy estate. *See Carlson v. Brandt,* 1997 WL 534500, at *2 (N.D.Ill. Aug. 22, 1997) ("[p]roperty of the estate includes all legal and equitable interests of the debtor in property . . . [t]he term property has been construed most generously and an interest is not outside its reach because it is novel . . . [i]n fact, every conceivable interest of the debtor, future, nonpossessory, contingent, speculative, and derivative, is within the reach of § 541," citing *In re Yonikus,* 996 F.2d 866, 869 (7th Cir.1993)); *Turner, supra,* 947 F.2d at 774 ("Fees earned on debtor attorney's executory contracts with his clients became part of bankruptcy estate, even though contracts themselves were not assumable by trustee and were not included in property of estate, to extent that fees were earned before bankruptcy filing"); and *In re Jess,* 215 B.R. 618, 621 (9th Cir. BAP 1997) ("the fact that postpetition services are nec-

essarily performed does not cause the right to payment for prepetition services to be excluded from the estate").

The Rawle Defendants, in opposition, assert that hourly-fee cases are neither property nor assets of the Debtor's estate. According to them, in the hourly-fee context, once the attorney-client relationship terminates and all outstanding invoices are paid, a law firm has no further proprietary interest in a particular case or matter. As a result, any additional fee generated by that particular case or matter is not an asset of the firm. In support of these arguments, the Rawle Defendants rely on the principle articulated in *Crabtree v. Academy Life Ins. Co.,* 878 F.Supp. 727, 730–31 (E.D.Pa.1995), *aff'd,* 106 F.3d 384 (3d Cir.1996), that "a client has the absolute right to terminate an attorney-client relationship ... [A] client has an obligation to pay an attorney for all services rendered prior to the termination, even if this results in a substantial bill for the client as a result of the termination", and in *Kenis v. Perini Corp.,* 452 Pa.Super. at 634, 641, 682 A.2d at 845, 849, which states that, "under Pennsylvania law, a client has the absolute right to terminate the attorney-client relationship regardless of any contractual arrangements between the two parties."

Next, the Rawle Defendants characterize hourly-fee cases as conditional contracts for services with clients and conclude that the hourly-fee cases are contingent, at-will agreements which cannot be considered partnership assets. They then cite principally to *George, supra,* 361 Pa. at 282, 64 A.2d at 813 ("Where services requiring peculiar skill are contracted for, the death of the party possessing that skill terminates the contract ... George's death terminated that contract and rendered it valueless."), and to cases analogous to *George, e.g., In re Stormer's Estate,* 385 Pa. 382, 387, 123 A.2d 627, 630 (1956); and *Lafferty v. Lafferty,* 174 Pa. 536, 34 A. 203 (1896).

Further, the Rawle Defendants argue that hourly-fee cases, like contingent-fee cases, are executory contracts in which further legal services must be performed before the matter may be brought to a conclusion. *See Tonry, supra,* 724 F.2d at 468 ("[A] contract is executory when something remains to be done by one or more of the parties ... [A]n attorney's contingent fee contract is executory if further legal services must be performed by the attorney before the matter may be brought to a conclusion.") Moreover, the Rawle Defendants observe that the Committee's present claim is for attorneys' fees that were generated by their new firms after the Debtor ceased operations. Under the analysis of *Turner, supra,* 947 F.2d at 774, they claim that these fees are not assets of the Debtor ("[C]ontingent fee contracts ... do not fall into the bankruptcy estate, but ... fees earned thereon prior to the date of the filing of the bankruptcy petition do").

Next, the Rawle Defendants assert that there is no basis in law for ordering them to account for post-dissolution hourly-fees that they, as opposed to the Rawle firm itself, have not received and do not own. The Rawle Defendants thus claim that the Debtor is not entitled to receive any fees which were generated through post-dissolution work performed by another law firm. To support these arguments, they rely on the fact that, following the Debtor's dissolution, they became partners at a new law firm. As a result, so they say, any profits received from post-dissolution hourly-fee cases belong not to them, but to their new law firm.

The Rawle Defendants further claim that, assuming *arguendo* that the hourly-fee cases were deemed to be an asset of the Debtor, they would be entitled to compensation for the work that their new law firm performed while handling these hourly-fee cases. In reaching this argument, the defendants rely on *Bracht v. Connell,* 313 Pa. 397, 404, 170 A. 297, 300, for its statement that "[t]he broad proposition that a partner is not entitled to compensation for · services in performing partnership matters or in winding up its affairs does not extend beyond those duties ... [Former partners who] were performing acts similar to those of a liquidating partner who continues unfinished business in an effort to complete it profitably, or as a surviving partner who carries on the business after the termination of the partnership. In these two situations, special compensation is allowed."

Finally, the Rawle Defendants contend that granting relief for the Committee would have a serious and prejudicial impact upon the attorney-client relationships and the ability of lawyers to change law firms. They claim that a dissolution of a law partnership technically occurs every time an attorney leaves a partnership. *Cf. In re Crutcher,* 209 B.R. 347, 352 (Bankr.E.D.Pa.1997). Although admitting that the PA's anti-dissolution provision purports to prevent this effect from occurring, they point out that some courts have suggested that such anti-dissolution provisions are unenforceable, citing *Wester & Co. v. Nestle,* 669 P.2d 1046 (Colo.App. 1983); and *Thomas v. American Nat'l Bank,* 704 S.W.2d 321 (Tex.1986). Accordingly, they argue, lawyers would be precluded from changing law firms because all profits from pending cases at the time of dissolution would belong to that particular lawyer's original firm.

In much the same vein, Hollenbach argues that the Debtor has no § 541(a)(1) property interest in the fees generated from the hourly-fee cases transferred at the time of dissolution and, therefore, the Committee's complaint must be dismissed. In support of this argument, Hollenbach asserts that (1) the Debtor was fully compensated for all the fees generated by its hourly-fee cases up to July 31, 1997; (2) any additional fees generated by these hourly-fee cases after August 1, 1997, belong not to the Debtor but to her new law firm; (3) from May 22, 1997, through July 31, 1997, she received no compensation for performing legal services which were invoiced to the clients and paid to the Debtor; and (4) after July 31, 1997, she continued on behalf of the Debtor to invoice clients for services performed prior to the Debtor's dissolution date of July 31, 1997, without any additional compensation. From the foregoing, Hollenbach concludes that the Debtor is not entitled to receive any fees which were generated through post-dissolution work which she performed on behalf of another law firm.

Kazcka, meanwhile, initially assets that he was not a partner of the Debtor. The main arguments of Kaczka to this effect are that he did not sign the PA and that he was never awarded any "partnership points," which he claims were necessary to accord him voting authority. However, Kaczka does concede that he was allowed to vote at the Debtor's partnership and that he received substantial distributions of the Debtor's profits. In addition, Kaczka also argued that the hourly-fee cases do not have any value to the Debtor and that the Debtor is therefore not entitled to any remittance.

 The PA is to be construed under Pennsylvania law, per ¶ 19.11 thereof. Although "partnership points" are referenced in ¶ 8.2 of the PA as determining a partner's interest in the Debtor, we see no specific reference therein to voting rights. More significant are the facts that, as evidenced by the income tax returns of the Debtor and him and his own testimonial admissions, Kaczka did share in the Debtor's profits and that he was permitted to vote at partnership meetings. The sharing of profits is prima facie evidence that a party is a partner. *See* 15 Pa.C.S. § 8312(4); and *City of Wheeling v. Chester,* 134 F.2d 759, 762 (3d Cir.1943). A partner's commitment to a partnership need not be in writing, *see e.g., Ruth v. Crane,* 392 F.Supp. 724, 734 (E.D.Pa.1975); and *Gohen v. Gravelle,* 411 Pa. 520, 522–23, 192 A.2d 414, 416 (1963), and may be established merely by conduct which manifests on intention that a party be considered a partner. *See Ruth, supra,* 392 F.Supp. at 734; and *Murphy v. Burke,* 454 Pa. 391, 395–98, 311 A.2d 904, 906–08 (1973). It is clear that Kaczka was treated like any equity partner of the Debtor for purposes of distribution of profits. Only equity partners were so treated. Therefore, we conclude that, unlike nonequity partners such as John R. Brown, *see Labrum V,* 225 B.R. at 104, Kaczka must be treated as a partner of the Debtor for purposes of the liabilities addressed herein.

 We find that the Committee's position with respect to its claims for net profits earned by the Debtor's former hourly-fee cases transferred to the Defendants upon dissolution is correct. Under PAUPA, a partnership does not terminate on dissolution, but continues to exist until the winding up of partnership affairs is completed. *See* PAUPA, 15 Pa.C.S. § 8352. *See also Ga-*

*gliardi v. Bennett,* 1998 WL 544954, at *5 (E.D.Pa. Aug. 21, 1998); *In re Berlin,* 151 B.R. 719, 723 (Bankr.W.D.Pa.1993); and *North Star Coal Co. v. Eddy,* 442 Pa. 583, 586, 277 A.2d 154, 156 (1971). Throughout the windup period, partners have a fiduciary duty to act in good faith toward one another and complete the "unfinished business" of the partnership without any additional compensation for this activity. *See* PAUPA, 15 Pa.C.S. §§ 8331, 8334(a), 8352; *Wolgin v. Smith,* 1996 WL 355338, at *4 (E.D.Pa. June 21, 1996); *Stainton v. Tarantino,* 637 F.Supp. 1051, 1066 (E.D.Pa.1986); and *Clement v. Clement,* 436 Pa. 466, 260 A.2d 728 (1970). Accordingly, partners are obliged to complete the work-in-progress of the partnership at the time of its dissolution, liquidate its assets, settle its liabilities, and distribute its profits, if any, among the partners. UNIFORM PARTNERSHIP ACT § 40, 6 UNIFORM LAWS ANNOT. 468–69 (1969); and R. HILLMAN, HILLMAN ON LAWYER MOBILITY, THE LAW AND ETHICS OF PARTNER WITHDRAWAL AND LAW FIRM BREAKUPS, § 4.6, at 4:59 (2d ed.1998). Only upon completion of the "unfinished business" is the partnership, and thus the fiduciary duty between partners, terminated. *See, e.g.,* 2 A. BROMBERG & L. RIBSTEIN, BROMBERG AND RIBSTEIN ON PARTNERSHIP, § 7.01(b), at 7:4 to 7.6 (1991); and 59A AM.JUR.2d 700 (1987 & Supp.1997).

On the basis of these principles, every other court confronted with this issue of division of post-dissolution proceeds of a law partnership has held that pending cases, regardless of whether they are hourly-fee cases or contingent-fee matters, are unfinished business requiring winding up after dissolution, and are therefore assets of the partnership subject to post-dissolution distribution. *See, Sufrin, supra,* 896 F.Supp. at 769; and *Jewel, supra,* 156 Cal.App.3d at 179, 203 Cal.Rptr. at 18. As it has been variously put by courts of many diverse jurisdictions:

> [P]rofits earned by … former [law] partners on matters pending at the firm at the time of dissolution billed not on a contingency basis but on an hourly rate basis, are 'property' under the Partnership Act … [U]nder the Partnership Act … hour-

ly rate matters as well as contingent fee matters are … treated as pending but unfinished business of a dissolved law firm. *Robinson v. Nussbaum,* 11 F.Supp.2d 1, 3, 7 (D.D.C.1997).

[U]nfinished business simply consists of all matters in progress which have not been completed at the time the [law] firm is dissolved. That one matter is to be compensated at an hourly rate and another on a contingency basis is of no consequence in determining whether a matter is unfinished business. *Rothman, supra,* 20 Cal. App.4th at 759, 24 Cal.Rptr.2d at 573.

Profits derived from the completion of legal cases or uncompleted transactions after dissolution of a law partnership are assets of the partnership, subject to distribution after dissolution … Between dissolution and completion of the wind-up, the partners have a fiduciary obligation to hold such assets for the benefit of the other partners. Absent an agreement to the contrary, fees must be shared regardless of which partner provides post-dissolution services. *Young v. Delaney,* 647 A.2d 784, 789, 792 (D.C.Ct.App.1994).

[P]ending cases are uncompleted transactions … and … assets of the partnership subject to post-dissolution distribution. *Beckman v. Farmer,* 579 A.2d 618, 636 (D.C.Ct.App.1990).

The law partnership's dissolution did not terminate its contractual relations with its clients. Consequently, among the affairs of the partnership requiring winding up were the pending cases the partnership had agreed to handle on a contingent fee basis. The fees from those cases were therefore assets of the partnership to be distributed in accordance with the provisions of the Uniform Partnership Act. *Ellerby v. Spiezer,* 138 Ill.App.3d 77, 81, 92 Ill.Dec. 602, 485 N.E.2d 413, 415 (1985).

Work in progress at the time of dissolution is an asset of the dissolved [law] firm and the partners of the dissolved [law] firm have an obligation to complete the work in progress. *Marr v. Langhoff,* 322 Md. 657, 667–68, 589 A.2d 470, 475 (1991).

Pending contingency files are uncompleted transactions of the partnership, and the fees obtained from such cases are assets of the [law] firm subject to distribution under the Uniform Partnership Act. *Hurwitz v. Padden,* 581 N.W.2d 359, 361 (Minn.App. 1998).

While fees from new work normally do not belong to a dissolved partnership, all partners of the dissolved [law] firm are generally entitled to share in fees for predissolution work in progress earned after dissolution, even if the client has exercised a right to discharge the attorney or attorneys who are sharing in the fees. *Gull v. Van Epps,* 185 Wis.2d 609, 624, 517 N.W.2d 531, 536 (1994).

*See also Grossman v. Davis,* 28 Cal.App.4th 1833, 1836, 34 Cal.Rptr.2d 355, 356–57 (1994); *Sheradsky v. Moore,* 389 So.2d 1206, 1207 (Fla.App.1980); *Kreutzer v. Wallace,* 342 So.2d 981 (Fla.App.1977); *Frates, supra,* 167 So.2d at 80–81; *In re Mondale & Johnson,* 150 Mont. 534, 542–43, 437 P.2d 636, 641 (1968); *Smith v. Daub,* 219 Neb. 698, 704, 365 N.W.2d 816, 820–21 (1985); *DelCasino v. Koeppel,* 207 A.D.2d 374, 615 N.Y.S.2d 454, 455 (1994); *Platt v. Henderson,* 227 Or. 212, 229–31, 361 P.2d 73, 81–82 (1961); *Gray v. Martin,* 63 Or.App. 173, 663 P.2d 1285 (1983); A. BLOMBERG & L. RIBSTEIN, *supra,* § 7.08, at 7:79 to 7:80; J.W. Callison, *Partnership Law Issues in the Break–Up and Dissolution of Law Firms,* 21 COLO. LAWY. 409, 413–14 (1992); M. Epstein & B. Wisoff, *Winding Up Dissolved Law Partnerships: The No–Compensation Rule and Client Choice,* 73 CALIF.L.REV. 1597, 1599, 1606–08 (1985); R. HILLMAN, *supra,* §§ 4.6.1 to 4.6.3, at 4:62 to 4:68; and C. Wang, *Breaking Up Is Hard to Do: Allocating Fees from the Unfinished Business of a Professional Corporation,* 64 U.CHI.L.REV. 1367, 1368–69 (1997).

■ In each of the above-cited cases the partners had no agreement that governed their rights and obligations, *inter se,* on the dissolution of the partnership. As a result, the courts applied general principles of partnership law. Without a written partnership agreement the courts normally will apply the Uniform Partnership Act to determine the rights of partners *inter se.* *See* A. Marks, *Barefoot Shoemakers: An Uncompromising Approach to Policing the Morals of the Marketplace When Law Firms Split Up,* 19 ARIZ.ST.L.J. 509 (1988). Provisions of the Act apply to all types of partnerships in the absence of a contrary agreement because its definition of business is all-inclusive. *See* T. Caddis, *Aurnou v. Greenspan: Rights of a Withdrawing Partner,* 18 J.LEG.PROF. 387, 389 (1993). The reason is that dissolution does not terminate or discharge pre-existing contracts between the partnership and its clients, and ex-partners who perform under such contracts do so as fiduciaries for the benefit of the dissolved partnership. *See, e.g.,* 59A AM.JUR.2d, *supra,* at 672–73. Fees received are therefore a partnership asset to be shared among the partners regardless of which former partner provides services in the case after dissolution.

Although the Defendants bluster about the allegedly disastrous public policy of such principles, they are unable to cite any cases from any jurisdictions regarding law firms to the contrary. The cases cited to the contrary only support the not inconsistent principle that clients can choose their lawyers. In response to the argument that, upon adoption of these principles, the "sky will be falling," we note that the Defendants are unable to point to any disasters which have developed in any of the many jurisdictions from which the cases cited above emanate.

The only case which does not apply these principles which we have located is *Kelly v. Smith,* 611 N.E.2d 118 (Ind.1993). However, that is because the court in that case found that a partnership agreement provided for partners to have a "clean break" on withdrawal. *Id.* at 121. That case, however, involved the withdrawal of a single partner, not a complete dissolution, of a firm, leaving little doubt that a partner's withdrawal was covered by the partnership agreement. *Id.* at 119. The court had no dispute with the cases applying partnership law principles in the absence of an applicable partnership agreement provision to the contrary. *Id.* at 121.

■ Having concluded that rights in fees generated in the hourly-fee cases belong to

the Debtor, we need only consider whether fees so derived from pre-existing contracts between the Debtor and its clients at the time of dissolution constitute assets of the Debtor's bankruptcy estate. With the passage of the Bankruptcy Code of 1978, Congress substantially broadened the scope of "property of the estate" of a debtor. *See e.g., United States v. Whiting Pools, Inc.,* 462 U.S. 198, 204–05, 103 S.Ct. 2309, 76 L.Ed.2d 515 (1983); *Integrated Solutions, Inc. v. Service Support Specialties, Inc.,* 124 F.3d 487, 490 (3d Cir.1997) ("The . . . Code defines a bankrupt's estate broadly to encompass all kinds of property, including intangibles and causes of action"); and *Yonikus, supra,* 996 F.2d at 869 ("[T]he term 'property' has been construed most generously and an interest is not outside its reach because it is novel or contingent or because enjoyment must be postponed"). As the legislative history of § 541 indicates, *see* H.R.REP. NO. 595, 95th Cong., 1st Sess. 175–76 (1977), *reprinted in* 1978 U.S.C.C.A.N. 5868–69; S.REP NO. 989, 95th Cong., 2d Sess. 82–83 (1978), *reprinted in* 1978 U.S.C.C.A.N. 6136–37, Congress intended property of the estate to include all property interests of a debtor.

Accordingly, every conceivable interest in property, future, nonpossessory, contingent, speculative, and derivative is within the reach of § 541. *See In re Anderson,* 128 B.R. 850, 853 (D.R.I.1991). The question whether an interest claimed by the debtor is "property of the estate," is moreover, a federal question to be decided by federal law. *Nobelman v. American Savings Bank,* 508 U.S. 324, 329, 113 S.Ct. 2106, 124 L.Ed.2d 228 (1993); *Butner v. United States,* 440 U.S. 48, 55, 99 S.Ct. 914, 59 L.Ed.2d 136 (1979); *Yonikus, supra,* 996 F.2d at 868; and *In re Manor Place Development Associates, L.P.,* 144 B.R. 679, 687 (Bankr.D.N.J.1992). Nevertheless, the courts are obliged to look to state law to determine whether the debtor has any legal or equitable interest in property as of the commencement of the case. *See Butner, supra,* 440 U.S. at 55, 99 S.Ct. 914; *In re Jones,* 768 F.2d 923, 927 (7th Cir.1985); and *In re Arrow Mill Development Corp.,* 185 B.R. 190, 194 (Bankr.D.N.J.1995). We are therefore compelled to return to state partnership law to determine whether the

fees at issue are property of the Debtor's estate.

Earlier in our discussion, we examined two fundamental principles of general partnership law. First, dissolution of a law partnership does not terminate existing contracts with its clients. And second, former partners who honor these existing contracts do so as fiduciaries for the benefit of the former partnership. From these principles, as applied and interpreted by the various states, we were easily able to conclude that hourly-fees derived from preexisting contracts between a law partnership and its clients at the time of dissolution are partnership assets, even if these fees were received after the partnership's dissolution. As we apply these principles in the context of bankruptcy law, we are similarly easily able to conclude that the Debtor has a legal and equitable interest in these hourly-fees. Stated another way, hourly-fees derived from work-in-progress pending at the time of dissolution are clearly property of the bankruptcy estate, as variously put by the bankruptcy courts when examining contingent fees earned in part before the filing the filing of the bankruptcy petition:

> [C]ontingent fee contracts . . . do not fall into the bankruptcy estate, but . . . fees earned thereon prior to the date of the filing of the bankruptcy petition do. *Turner, supra,* 947 F.2d at 774.

> [W]hile a bankruptcy estate is generally not entitled to fees earned after a debtor has filed for bankruptcy, "post-petition payments for services actually performed or income actually earned pre-petition" are considered property of the estate . . . [A]lthough an attorney's contingent fee agreements do not themselves comprise part of the bankruptcy estate, "fees earned prior to the date of bankruptcy filing do." *Carlson, supra,* 1997 WL 534500, at *2, quoting *In re Carlson,* 211 B.R. 275, 279 (Bankr. N.D.Ill.1997).

> [The debtor] had an interest arising prepetition that is property of the bankruptcy estate. *Jess, supra,* 215 B.R. at 622.

> [T]hose portions of [a debtor's] contingent attorney's fees which may be paid postpeti-

tion, but were nevertheless earned and rooted in his prepetition past, should be includable in his bankruptcy estate. *In re Bagen,* 186 B.R. 824, 829 (Bankr.S.D.N.Y. 1995), *aff'd,* 201 B.R. 642, 643–44 (S.D.N.Y. 1996) ("Under the new Bankruptcy Code, Congress intended property of the estate to include ... [the] debtor's contingent contract right to future payments").

[T]he value of [a debtor's] services rendered pre-petition on his contingent fee contracts is property of the bankruptcy estate. *Watts v. Williams,* 154 B.R. 56, 58 (S.D.Tex.1993).

As these decisions illustrate, "[t]he Bankruptcy Code intends to recognize economic realities, and the economic realities are that the work already done on open cases had an economic value at the time of the filing of the petition, notwithstanding that collection of the fee could be subject to defeasance for a vast number of reasons, including neglect to complete the work, discharge for cause, or just losing at trial." *Bagen, supra,* 201 B.R. at 644. Although these cases involve contingent-fee matters, no known authority makes any distinction between contingent-fee and hourly fee cases, while numerous authorities emphasize that there is no distinction. *See, e.g., Robinson, supra,* 11 F.Supp.2d at 3–6; *Rothman, supra,* 20 Cal.App.4th at 757–58, 24 Cal.Rptr.2d at 572–73; *Platt, supra,* 227 Or. at 231–32, 361 P.2d at 82; and J.W. *Callison, supra,* 21 COLO.LAWY. at 414. Hence, fees derived pre-petition, regardless of whether they are hourly or contingent fees, are partnership assets that belong to the bankruptcy estate.

The arguments and authorities cited by the Defendants cannot overcome these conclusions. The *Kenis* and *Crabtree* holdings cited by the Rawle & Henderson Defendants have little bearing on the issues at hand. The fact that a client has the absolute right to terminate the attorney-client relationship does not contradict nor diminish the conclusions presented above. Similarly, the *George* and *Stormer* holdings have nothing to do with the issues in question. The Committee is not seeking to assume or take over the Defendants' cases, but simply to claim a part of their proceeds for the Debtor. The *Tonry*

and *Turner* holdings, on the other hand, have simply been misread. In *Tonry,* the question presented was whether a bankruptcy trustee could assume, as assets of the estate, contingent-fee contracts in which legal services remained to be rendered after the bankruptcy petition filing. *Tonry, supra,* 724 F.2d at 468. In *Turner,* the sole issue was the question of entitlement to fees generated by a debtor-attorney in the completion of contingent-fee contracts in which some of the work occurred prior to filing the Bankruptcy petition. *Turner, supra,* 947 F.2d at 774. Thus, in *Tonry,* the trustee sought to assume the contracts themselves as assets of the estate at a time when legal services remained to be performed, whereas in *Turner* the trustee sought to assume fees earned for pre-petition work on completed contracts. The Committee is, again, not seeking to assume the Defendants' contracts. Finally, the Rawle Defendants' contentions that (1) there is no basis in law for ordering them to account for post-dissolution hourly-fees; and (2) they are entitled to compensation for work performed while handling the cases at issue, simply contradicts the statutorily-mandated provisions embodied in PAU-PA.

We also reject Hollenbach's argument that the Debtor was fully compensated for all work-in-progress as of July 31, 1997, and that therefore any hourly-fees generated from the transferred files after that date belong not to the Debtor, but to her new law firm. As noted above, the dissolution of a law partnership does not terminate existing contracts with its clients. We also find no merit in Hollenbach's argument that she received no compensation for performing legal services up to the time of dissolution and that she continued to invoice clients for services performed without any additional compensation. In doing so, Hollenbach was simply performing her duties as a partner. As noted earlier, former partners who honor existing contracts do so as fiduciaries for the benefit of the former partnership with no remuneration for services performed.

At first blush, this holding may appear unfair. Nevertheless, the following language

in *Robinson, supra,* 11 F.Supp.2d at 6, sheds light on the reasoning behind it:

> First and foremost, partners are free (indeed encouraged) to execute written partnership agreements which provide for an exact disposition of profits from hourly rate matters after dissolution.
>
> Second, the rule which the court establishes applies only to profits earned from work which finishes matters pending at the former law firm at the time of its dissolution. Profits earned by former partners on new matters brought into the firm after the date of dissolution, including new matters for clients of the dissolved law firm, are not the property of the dissolved partnership. Former partners are not forced to account for the fruits of business they acquired independently.
>
> Third, each and every partner finishing uncompleted client matters must account to the dissolved partnership.

In the case at bar, we have held that the Debtor's PA was silent as to the allocation of attorneys' fees at the time of dissolution. As a result, the former partners must bear the consequences of their failure to provide for allocation of fees in their agreement.

4. *The MRPC Does Not Purport to Address the Issues at Hand and Therefore Does Not Preclude a Recovery for the Debtor.*

All of the Defendants, with varying degrees of vitality, contend that a decision in favor of the Committee would somehow violate the MRPC. The particular Rules cited are MRPC 1.5(e) 1.8(j), 5.4, and 5.6, which, with a pertinent comment to MRPC 1.5(e), read as follows:

**Rule 1.5 Fees**

. . .

(e) A lawyer shall not divide a fee for legal services with another lawyer who is not in the same firm unless:

(1) the client is advised of and does not object to the participation of all lawyers involved, and

(2) the total fee of the lawyers is not illegal or clearly excessive for all legal services they rendered the client.

. . .

**COMMENT**

. . .

**Division of Fee.**

A division of fee is a single billing to a client covering the fee of two or more lawyers who are not in the same firm. A division of fee facilitates association of more than one lawyer in a matter in which neither alone could serve the client as well, and most often is used when the fee is contingent and the division is between a referring lawyer and a trial specialist. Paragraph (e) permits the lawyers to divide a fee if the total fee is not illegal or excessive and the client is advised and does not object. It does not require disclosure to the client of the share that each lawyer is to receive.

. . .

**Rule 1.8 Conflict of Interest: Prohibited Transactions**

. . .

(j) A lawyer shall not acquire a proprietary interest in a cause of action that the lawyer is conducting for a client, except that a lawyer may:

(1) acquire a lien granted by law to secure the lawyer's fee or expenses; and,

(2) contract with a client for a reasonable contingent fee in a civil case.

. . .

**Rule 5.4 Professional Independence of a Lawyer**

(a) A lawyer or law firm shall not share legal fees with a nonlawyer, except that:

(1) an agreement by a lawyer with the lawyer's firm, partner, or associate may provide for the payment of money, over a reasonable period of time after the lawyer's death, to the lawyer's estate or to one of more specified persons:

(2) a lawyer who undertakes to complete unfinished legal business of a deceased lawyer may pay to the estate of the deceased lawyer that proportion of the total compensation which fairly represents the services rendered by the deceased lawyer; and

(3) a lawyer or law firm may include nonlawyer employees in a compensation or retirement plan, even though a plan is based in whole or in part on a profit-sharing arrangement.

. . .

## Rule 5.6 Restrictions on Right to Practice

. . .

A lawyer shall not participate in offering or making:

(a) a partnership, shareholders, operating, employment or other similar type of agreement that restricts the rights of a lawyer to practice after termination of the relationship, except an agreement concerning benefits upon retirement; or

(b) an agreement in which a restriction on the lawyer's right to practice is part of the settlement of a controversy between private parties.

The Rawle Defendants and Hollenbach focus upon MRPC 1.5(e), 1.8(j), and 5.6. They argue that providing relief to the Committee would constitute a sharing of fees unless the clients consent, pointing out that there is no evidence of record that any of the Debtor's former clients consented to a splitting of fees. They further contend that a judgment for the Committee would result in increased legal costs. They also claim that MRPC 1.8 is violative of the prohibition of an attorney's acquiring a proprietary interest in any cause of action other than a lien to secure the payment of fees or a contract securing reasonable contingency fees. Finally, they invoke *Leonard & Butler, supra,* 279 N.J.Super. at 668–69, 653 A.2d at 1198 (stating that a "provision of [an] employment agreement between attorney and law firm, violated rule prohibiting employment that restricted rights of attorney to practice after termination of relationship with law firm"); and *Jacob, supra,* 128 N.J. at 36, 607 A.2d at 155 ("[t]he agreement's competitive departure provision restricts the practice of law in contravention of RPC 5.6 and is therefore unenforceable as against public policy"), in support of an argument that MRPC 5.6 would be violated were the Committee to prevail. In like manner, Hollenbach asserts that, as Epstein testified, MRPC 1.5, 1.8, and 5.6 would be violated by a decision in favor of the Committee.

Kazcka, meanwhile, emphasizes MRPC 5.4 and 5.6, contending that the Committee's proposed remedy violates these provisions of the MRPC by constituting (1) an improper sharing of fees; (2) a restriction on the rights of attorneys to practice law; and (3) a restriction on clients' ability to select the attorney of their choice. Kazcka, not surprisingly, relies heavily on the testimony of his expert witness Strosnider, and his analysis of *Leonard & Butler, supra;* and *Jacob, supra.*

Finally, Fogelberg maintains by way of his affidavit that requiring him to pay any monies to the Debtor would violate the version of the MRPC embodied in the laws of the state of New York.

We believe that the Committee's counter-position discounting any potential violations of the MRPC is correct. We note, far from prohibiting same, Rule 1.5(e) of the MRPC merely purports to regulate the manner in which lawyers from different firms *may* split a fee. *See* L. Terry, *Ethical Pitfalls and Malpractice Consequences of Law Firm Breakups,* 61 TEMP.L.REV. 1055, 1083 (1988). Under DR 2–107(A) of the predecessor MODEL CODE OF PROFESSIONAL RESPONSIBILITY, lawyers were permitted to share a client's fee only if (1) the client consented to employment of both lawyers after a disclosure that the client's fee payment would be split; (2) the fee was divided "in proportion to the services performed and responsibility assumed" by each lawyer; and (3) the total amount of the fee was not unreasonable for the total amount of legal services rendered. C. WOLFRAM, MODERN LEGAL ETHICS, § 9.2.4, at 511–12 (1986). The MRCP, meanwhile, relaxes the procedure for fee splitting in two respects. First, under MRPC 1.5(e), either the shares of each lawyer may reflect the respective amounts of services performed, as under DR 2–107(A)(2), or "by written agreement with the client, each lawyer assumes joint responsibility for the representation." *Id.* Second, the provision for client disclosure and consent is

perfunctory compared to DR 2–107(A)(1); all that Rule 1.5(e) requires is that the client be advised of "the participation of all the lawyers involved" and "does not object." *Id.* As the comment quoted at page 412 *supra* expressly states, Rule 1.5(e) permits lawyers to divide a fee if the client does not object and does not require disclosure of the share that each lawyer is to receive. Moreover, these Rules apply exclusively to situations where lawyers from different firms engage in fee-sharing arrangements. Thus, we find no significance in assertions that none of the Debtor's former clients consented to a splitting of fees.

■ The cases which have addressed the issue confirm that no ethical Rules apply to the splitting or sharing of fees in winding up partnership affairs. *See Sufrin, supra,* 896 F.Supp. at 769; *Ellerby, supra,* 138 Ill. App.3d at 81, 92 Ill.Dec. 602, 485 N.E.2d at 413; and *Gull, supra,* 185 Wis.2d at 616, 517 N.W.2d at 533. *See also,* A. BROMBERG & L. EPSTEIN, *supra,* § 7.08, at 7:83. We previously noted that a law partnership does not terminate on dissolution, but continues to exist until the winding up of partnership affairs is completed. *See* PAUPA, 15 Pa.C.S. § 8352. Therefore, the partnership's contractual relationship with its clients does not terminate upon the entity's dissolution. *See Saltzberg v. Fishman,* 123 Ill.App.3d 447, 78 Ill.Dec. 782, 462 N.E.2d 901, 907 (1984). Until the partnership's affairs are wound up, the entity remains intact for the purposes of completing its affairs, and lawyers remain in the same firm until that process is completed. *See also Tomar, Seliger, Simonoff, Adourian & O'Brien, P.C. v. Snyder,* 601 A.2d 1056, 1058 (Del.Super.1990) ("By its own terms, Rule 1.5(e) does not apply to lawyers who are in the same firm ... since the contingent fee cases originated with plaintiff Tomar, Seliger and the firm performed legal services in connection with the cases prior to Snyder's resignation from the firm, the fee division agreement its valid and enforceable and does not violate Rule 1.5(e)"); *La Mantia v. Durst,* 234 N.J.Super. 534, 542–43, 561 A.2d 275, 279 (1989), *certification denied,* 118 N.J. 181, 570 A.2d 950 (1989) ("It is not uncommon for a law firm to and a departing attorney to divide the fees

resulting from contingent fee cases which the attorney has been handling and will continue to handle after he leaves").

■ With respect to the contentions that a judgment for the Committee would create a restriction on clients' ability to select the attorney of their choice, we disagree. Although we agree that a client has the absolute right to terminate the attorney-client relationship regardless of any contractual arrangements between the parties, *see Kenis, supra,* 452 Pa.Super. at 641, 682 A.2d at 849, this fact does not support the conclusion which the Defendants, particularly Kazcka, seek to draw from it. In the case at bar, the former clients of the Debtor were free to be represented by any member of the dissolved partnership or by other attorneys of their choice. This right of the client is distinct from and does not conflict with the rights and duties of the partners between themselves with respect to profits from unfinished partnership business since, once the fee is paid to an attorney, it is of no concern to the client how the fee is distributed among the attorney and his or her partners. *See Sufrin, supra,* 896 F.Supp. at 769; and *Jewel, supra,* 156 Cal.App.3d at 177–78, 203 Cal. Rptr. at 17. Again, this does not result in improper fee splitting as suggested by the Defendants, since, as we previously noted, the partnership continues until its winding up has been completed. It is perfectly proper for law partners to split fees among themselves. *Ellerby, supra,* 138 Ill.App.3d at 81, 92 Ill.Dec. 602, 485 N.E.2d at 413. *See also, Tomar, supra,* 601 A.2d at 1058. Finally, we note that we rejected a similar argument in *Labrum VI,* 226 B.R. at 169.

We also find no merit with respect to the Defendants' position about the applicability of 1.8(j). This rule, which has its basis in common law champerty and maintenance, is inapplicable to the issues at bar, since those practices are not at issue. More precisely, neither the Committee nor the Debtor have attempted to acquire an interest in a client's cause of action or the subject of any litigation. On the contrary, the Committee has merely sought to recover for the Debtor the proceeds generated by hourly-fee cases in

progress at the time of dissolution which were transferred to the Defendants after August 1, 1997.

█ We are also unimpressed with the Defendants' contentions that a judgment for the Committee would violate MRPC 5.4 or 5.6(a). Those rules address agreements which restrict the rights of partners or associates to practice law after leaving a given law firm. Restrictive covenants, such as were at issue in *Leonard & Butler, supra;* and *Jacob, supra,* are decidedly not at issue here. Again, the Committee has sought to recover only the proceeds generated by hourly-fee cases in progress at the time of dissolution. As we held at pages 401–402, *supra,* the PA is silent as to the allocation of attorneys' fees at the time of dissolution. Partners are free to execute written partnership agreements which provide for an exact disposition of profits from hourly rate matters after dissolution. Therefore, the former partners must bear the consequences of their failure to provide for allocation of fees in their agreement.

Lastly, we find no merit in the Rawle Defendants' position that a judgment for the Committee would result increased legal costs and could prejudicially impact attorney-client relationships and the formation of law partnerships. Although every known jurisdiction addressing the issue has accepted the Plaintiff's PAUPA-based arguments, there are no indications of any such negative results flowing from these decisions. On the contrary, the sound policy reasons espoused by these decisions have prevented partners in those jurisdictions from competing for the most remunerative cases during the life of the partnership in anticipation that they might retain those cases should the partnership dissolve. *See Jewel, supra,* 156 Cal.App.3d at 179, 203 Cal.Rptr. at 18. These rulings have also discouraged former partners from scrambling to take physical possession of files and seeking personal gain by soliciting a firm's existing clients upon dissolution. *Id.*

█ We therefore follow all known authority in concluding that there is no conflict between the MRPC and the retention of post-dissolution fees by the Debtor.

**5. *Although the Defendants Have Therefore Derived Proceeds from the Hourly–Fee Cases of the Debtor Transferred at the Time of Its Dissolution Which They Must Share with the Debtor, the Valuation Formula Presented by the Committee's Expert Failed to Properly Measure the Value Generated by These Cases Following Dissolution, Requiring Further Consideration of the Issue of the Amounts Due.***

Having determined that the Defendants are indeed liable to the Debtor for at least some of the profits which they derived from the hourly-fee cases transferred to them at the time of the Debtor's dissolution, the issue remains as to how to measure the Debtor's entitlements from each of the Defendants.

The Committee contends that all of the Defendants received value from the hourly-fee cases transferred at the time of dissolution. In measuring same, the Committee relies on the evidence and testimony presented at trial by its expert Miller. Based on data received through discovery, the Committee concludes that for, the twelve-month period following the Debtor's dissolution, the billings generated by the various Defendants' firms on cases and matters formerly handled by the Defendants while partners of the Debtor were as follows:

(1) The Rawle Defendants, $2,103,419;

(2) Hollenbach, $428,827.50;

(3) The Marshall Defendants, $749.,095.85; and

(4) Fogelberg, $342,461.

The Committee then proceeds to focus on Miller's analysis of the value of the "books of business" generated by these hourly-fee cases to negotiate their present compensation packages at their new law firms, with the exception of Fogelberg, who allegedly simply retained the Debtor's New York City office for no consideration. Next, the Committee maintains that the "formula" proposed by its expert provides a fair valuation of, the books of business containing hourly-fee cases transferred to the Defendants at the time of dissolution. The formula in question utilizes the revenues generated by these cases for a one (1) year period of time, post-dissolution,

as a means by which to determine the value of what has been transferred and the amount that the Defendants should be required to reimburse the Debtor's estate. To properly achieve a "fair" valuation, the Committee, following Miller's testimony, posits that the revenue generated by these transferred cases must be multiplied by one of three different revenue multipliers:

(1) *The Debtor's Actual Value, i.e.,* the normalized average of profit realized by the Debtor over a five-year (1992–1996) period, as evidenced by the Debtor's financial statements, or 12.63% multiplied by the revenues generated by the transferred cases over a one (1) year period of time.

(2) *The Industry's Real Value, i.e.,* the average profitability standards for the legal industry in the Philadelphia area, as evidenced by the Institute of Business Appraisers, or 17.1% multiplied by the revenues generated by the transferred cases over a one (1) year period of time.

(3) *The Debtor's Adjusted Value, i.e.,* what the benefit of the Debtor's firm would have been, had the firm been acquired by another firm, or 26.08% multiplied by the revenues generated by the transferred cases over a one (1) year period of time.

After displaying these different multipliers, Miller proposed utilizing the industry average of 17.1%. Applying this multiplier to the gross amount of billings of the various Defendants, as set forth at page 415 *supra,* Miller concludes that the dollar amount that the Defendants should be required to reimburse the estate is as follows:

| DEFENDANTS | AMOUNT |
| --- | --- |
| The Rawle Defendants | $359,683 |
| Hollenbach | $ 73,329 |
| The Marshall Defendants | $128,095 |
| Fogelberg | $ 58,561 |
| **TOTAL** | **$619,668** |

The Rawle Defendants argue, first, that there can be no recovery at this time because the Committee has failed to show that any profits were indeed generated from the hourly-fee cases transferred at the time of dissolution. To support this conclusion, the Rawle Defendants observe that, during the course of the trial, Miller never addressed, supported, or established the profit generation requirements mandated by the *Jewel* decision.

Further, the Rawle Defendants maintain that there is no basis in fact and equity to adopt the 17.1% profitability ratio advanced by the Committee. As these Defendants point out, this ratio is totally divorced from the actual earning history of the Debtor. In reaching this conclusion, the Rawle Defendants rely on the fact that, before closing its doors in July 1997, the Debtor operated at a loss of 2.74%. Hence, they posit that there is no basis whatsoever to assume that the Debtor would have earned a 17.1% profit rate on all hourly-fee cases handled between July 31, 1997, and July 31, 1998. In fact, the Rawle Defendants observe that it is sheer speculation to assume that the Debtor would have earned any profits during this time period.

Although this evidence is not referenced in their post-trial brief, we note that an Affidavit of Hope Furlow, the Rawle firm's billing coordinator, indicated that certain costs were advanced by the Rawle firm which may have not been completely reimbursed by clients, and we observe that Heck provided testimony and an exhibit which purported to quantify "direct costs" accruing to the Rawle firm as a result of its taking on the Rawle Defendants as partners.

Similarly, Hollenbach asserts that the valuation "formula" presented by the Committee is baseless and contrived, and therefore does not support the award of any amount to the Committee. To support this position, Hollenbach basically maintains that there is no factual basis for Miller's conclusion regarding the fair value of the hourly-fee cases utilizing any of his proposed multipliers. According to Hollenbach, the profitability of the Debtor can be ascertained from Miller's own "Income Normalization" tables which establish that, for the last seven years, the Debtor's profit ratio ranged from a low of 1.65% in 1995 to a high of 16.11% in 1992. In all of

the years reviewed by Miller, the Debtor never even came close to the 20% mark. Hollenbach contends that the Debtor's five-year profit ratio of 12.63%, not 17.1%, should be preferred as a multiplier.

Next, Hollenbach observes that the Committee's valuation analysis not only misapplies the use of profitability ratios, but is based on erroneous firm billing amounts. To support this argument, Hollenbach references a revenue summary chart affidavit submitted by her at trial which categorizes the nature of all the hourly-fee files transferred by her at the time of dissolution. The following is a portion of the information contained in the chart:

**TALLMAN HUDDERS & SORRENTINO, P.C.**
**REVENUE SUMMARY CHART**
**JULY 28, 1997 THROUGH JULY 23, 1998**

| CATEGORY | FEES BILLED | FEES RECEIVED |
|---|---|---|
| Total for all hourly-fee files transferred from the Debtor | $428,827.00 | $311,824.00 |
| Total for hourly-fee files from the Debtor where Hollenbach was the originating attorney for her new firm | $338,808.00 | $228,224.50 |
| Total for hourly-fee files transferred from the Debtor with other attorneys at Hollenbach's new firm as originating attorney | $ 90,019.51 | $ 83,600.00 |
| Total for hourly-fee files for clients which Hollenbach brought to the debtor from her former firm | $308,305.50 | $198,546.00 |
| Total for hourly-fee files for clients of the Debtor which were not clients of Hollenbach at former firm; that is, Debtor generated clients. | $ 30,502.00 | $ 29,678.50 |

As evidenced by this chart, Hollenbach maintains that the Committee's analysis erroneously attributed to her the total for all the hourly-fee files transferred from the Debtor to her new firm in the amount of $428,827. She points out that Miller's figures assume that all of the cases flowing to her present firm from the Debtor were hers. Correcting this alleged error. Hollenbach contends that she was the originating attorney only as to $338,808 of the $428,827.50 figure utilized and that non-defendant attorneys were the originators on the remaining amounts.

More dramatically, Hollenbach contends that the Committee's premise that the Debtor originally developed all the hourly-fee files which she was handling for the Debtor at the time of dissolution is greatly mistaken. To support this contention, Hollenbach testified that most of the hourly-fee files taken by her from the Debtor after July 1997 were files originated by her before she joined the Debtor in or about 1990. Accordingly, removing the dollar amount of these hourly-fee files, she reduces Miller's beginning amount by an additional $308,305.50. Hollenbach thus claim that, assuming *arguendo* that the Debtor is entitled to some recovery from her, the total hourly-fee files generated by her after she joined the Debtor amounted to only $30,502.50.

Finally, Hollenbach returns to her argument that Miller's multipliers are erroneously contrived and argues that, even if the Committee's underlying premise that the Debtor has an interest in the value generated by the hourly-fee cases transferred at the time of dissolution is correct, the Debtor's actual profitability value of 12.63% is what was lost. She applies this multiplier to the

$30,502.50 figure, and recomputes her potential liability as but $3,852.46.

Kaczka also maintains that the opinions of Miller are not based on pertinent facts. Like Hollenbach, he contends that it is illogical for Miller to assert a 17.1% profitability ratio, which was an increase of approximately 5% over his own calculated figures of the profitability of the Debtor's firm for the five-year pre-dissolution period. Kazcka further criticizes Miller's calculation of an entitlement to greater profitability than the Debtor would have had it remained in business. Kazcka finally maintains that the hourly-fee cases have no value and that the Committee is not entitled in any way to any remittance. Kaczka does not, like Hollenbach, offer alternative potential calculations. However, we note that, like Hollenbach and the Rawle Defendants, each of the Marshall Defendants testified that Miller had included numerous cases which were brought over to their new firm by associates, rather than by the Marshall Defendants themselves, in his calculations.

Finally, Fogelberg asserts, by way of his affidavit, that the billing and collection figures recited by the Committee are "false" and are derived from notes on a printout from his computerized billing service which was never examined by him for accuracy and is for that reason not accepted by him as accurate. He therefore argues that the Committee is not entitled to relief on the basis of it.

In part, the Committee's position with respect to the profits generated from the cases at bar appears correct. The Committee has convincingly demonstrated throughout the entire Proceeding that the Defendants indeed generate post-dissolution profits from the hourly-fee cases transferred at the time of dissolution. However, we cannot agree with the theory utilized by Miller to measure the damages. The issue at hand is not the value of "books of business" transferred by the Debtor to the Defendants' new firms, but rather the value of the partnership assets "wound down" by its partners.

Nor can we agree with the accuracy of some of the data which Miller utilizes. First, we agree with the Defendants insofar as they argue that a significant portion of the dollar amounts of fees generated were erroneously assigned to the Defendants when in fact same was generated by associates. One of the underlying principles of the PAUPA theory on which liability is based is that only funds generated by the partners themselves can be utilized as a basis for recovery.

Thus, in analyzing the dollar amount of the hourly-fee cases as to the Rawle Defendants, the Committee erroneously subscribed to the defendants the total for *all* the hourly-fee files transferred from the Debtor to the Rawle firm in the amount of $2,103,419. As verified by Ashdale's testimony, some of the transferred files belonged to other attorneys and associates, not to the Rawle Defendants. Accordingly, the Committee's beginning dollar amount is erroneous. Ashdale's testimony, which is uncontested, provided evidence that the Rawle Defendants were the originating attorneys as to $1,451,764.61 of the proceeds realized by the Rawle firm in the year in question, and the other attorneys and associates were the originating attorneys on the remaining amounts.

In like manner, the Committee erroneously subscribed to Hollenbach the total for all the hourly-fee files transferred in the amount of $428,827. As evidenced by Hollenbach's own testimony and her present firm's revenue summary chart displayed at pages 416–417 *supra,* the Committee figures included profits generated by other attorneys at her new firm which are not properly attributable to Hollenbach. As a result, the Committee's beginning amount of $428,827 is erroneous because Hollenbach testified without rebuttal that she was the originating attorney only as to $338,808 of it and that other attorneys originated the remaining amounts.

More significantly for Hollenbach, it is consistent with the Debtor's PAUPA theory that only cases of the Debtor which were originated by her during her tenure with the Debtor are subject to the Committee's claims. As a result, her uncontested testimony of the hourly-fee cases and matters brought with her from prior firms would appear to be properly reduced by $308,305.50, representing the proceeds from cases and matters which she originated prior to joining the

Debtor, resulting in a net dollar amount of $30,502.

None of the Marshall Defendants were able to quantify the amount of the Marshall firm's proceeds attributable to associates other than themselves. However, it is clear that this is an aspect of their defense. If interpreted charitably, the same may be said of Fogelberg's questioning of the data supplied by his computer billing service to the Committee.

With respect to the valuation "formula" proposed by the Committee, we find that the Committee misapplied the *Jewel* and *Sufrin* decisions when it failed to adopt the valuation and distribution methodologies proposed by those decisions. *See Sufrin, supra,* 896 F.Supp. at 768; and *Jewel, supra,* 156 Cal. App.3d at 174, 203 Cal.Rptr. at 16. Earlier in this decision, we agreed with a long line of persuasive authorities holding that pending cases, regardless of whether they are hourly-fee cases or contingent-fee matters, are unfinished partnership business requiring winding up after dissolution, and therefore are partnership assets that must be distributed to each partner according to his or her share. *See, Robinson, supra,* 11 F.Supp.2d at 3; *Rothman, supra,* 20 Cal.App.4th at 757, 24 Cal.Rptr.2d at 572; *Beckman, supra,* 579 A.2d at 636; and *Sullivan, supra,* 16 Kan. App.2d at 210–11, 820 P.2d at 1250. These authorities were not based solely on general principles of partnership law, but also cited sound policy reasons for their holdings. As noted by the court in *Jewel,* 156 Cal.App.3d at 179, 203 Cal.Rptr. at 17:

> [This methodology] prevents partners from competing for the most remunerative cases during the life of the partnership in anticipation that they might retain those cases should the partnership dissolve. It also discourages former partners from scrambling to take physical possession of files and seeking personal gain by soliciting a firm's existing clients upon dissolution. [Defendants] argue that [the] application of this [methodology] in the present context will discourage continued representation of clients by the attorney of their choice, as former partners will not want to perform all of the post-dissolution work on

a particular case while receiving only a portion of the income generated by such work. Of course, this is all the former partners would have received had the partnership not dissolved.

■ Nevertheless, the Committee, perhaps distracted from utilizing the *Jewel* methodology by our statements in *LaBrum II*, at *5, before we had a completed record or body of research, that these principles might be neither equitable nor logical when applied to a large, insolvent firm like the Debtor, overlooks these principles and instead applies a valuation "formula" which itself is in fact neither equitable nor logical. As noted by several of the Defendants, there is no factual basis for the formula proposed by Miller, especially when we examine the Debtor's performance over its last seven years and realize that not even once did it come close to the profitability ratio utilized by Miller. Thus, there is no logical basis to conclude that the Debtor should be compensated on the basis of a 17.1% profit rate on all the hourly-fee cases handled between July 31, 1997 and July 31, 1998. Most importantly, the "formula" currently proposed is not supported by the authorities relied upon by the Committee for its substantive claims of rights to the Defendants' profits. These authorities simply contemplate the fair distribution of all partnership assets and liabilities at the time of dissolution according to each individual's interest in the partnership. The Committee's formula, on the other hand, ignores these principles and purports to measuring the "profit" realized by the dissolved partners from transfers of their "books of business." Accordingly, we reject the Committee's valuation formula and are prepared to apply instead the form of relief contemplated by the authorities cited by the Committee, *i.e.,* the net profits which accrued on the hourly-fee cases and matters initiated while each of the Defendants worked for the Debtor which generated fees for each of the Defendants at their new firms, with a deduction of each individual Defendant's own partnership interest.

Having said all of the foregoing, we are not prepared to quantify the Committee's recoveries from the Defendants at this juncture.

As in *Labrum V*, we are deciding a matter of virtually first impression in this jurisdiction, and very few of the authorities from other jurisdictions provide detailed calculations of amounts due when their principles are applied to specific facts. While we are prepared to grant the declaratory relief as to liability as requested in Count One of the instant complaint, and we will ultimately enter a judgment for damages after calculations based on the principles which we believe are controlling, we are inclined to first give all interested parties a chance to supplement the record in light of our legal conclusions set forth herein and thereafter to offer their own calculations. We will require the parties to indicate what supplemental evidence they want to present, if any, by December 21, 1998, and we will schedule a supplemental trial on January 6, 1999. *Compare Labrum V*, 225 B.R. at 106–07. These time periods are short but unlikely to be flexible, as they are in the nature of a dispensation. As we preceded to do in the contingent-fee proceeding, *see id.* at 107–09, we will nevertheless provide some preliminary, nonbinding calculations by way of an example of our present thinking as to how calculations should be made.

We believe that the relevant raw data from which a calculation must be made are the Defendants' individual "Revenue Amounts," *i.e.*, the revenues generated by each partner on cases and matters inherited by them from the Debtor. From that we proceed to calculate the partner's own share, which the partner may retain. From this, the partner is permitted to make certain deductions to the gross proceeds to reach a net figure, notably out-of-pocket costs expended and ascertainable overhead. *See Robinson, supra,* 11 F.Supp.2d at 6; *Jewel, supra,* 156 Cal.App.3d at 180, 203 Cal.Rptr. at 19–20; *Beckman, supra,* 579 A.2d at 633; and J.W. Callison, *supra,* 21 COLO.LAWY. at 414. The "Revenue Amounts" in the following charts, see page 80 *infra,* would be reducible by costs and overhead, if proven. However, unless the case or matter is separate and distinct "new business," *compare Cf. Bracht, supra,* 313 Pa. at 404, 170 A. at 300, no compensation for the Defendants' own services can be allowed. With respect to the Rawle Defendants' evidence presented by the Furlow Affidavit and Heck's calculations, unreimbursed costs and certain "indirect costs," *i.e.,* equipment and furniture rentals, actual rent, insurance, and other operating costs attributable solely to reimbursable gross profits of the Rawle Defendants themselves would appear to be deductible. We hasten to add that Heck's figures, which appear to include costs attributable the Debtor's former associates, would have to be significantly revised to be acceptable. The net amount resulting is the "Reimbursement Amount," which is the partner's liability in the Debtor.

We also note, with approval, the Committee's use of a one-year period in which proceeds are measured to determine liability. While this time-period is obviously somewhat arbitrary, it is less than a claim into perpetuity, which we believe would be permissible under the formula suggested by cases such as *Sufrin* and *Jewel,* and therefore we believe that it is conservative and quite equitable to the Defendants. As the Committee notes, use of some finite period neutralizes any argument that the Defendants are compelled to perform services for clients on behalf of the Debtor indefinitely without compensation and that all incentives to serve ex-clients at the Debtor are eliminated.

With the foregoing caveats, we tentatively estimate as follows the Defendants' respective liabilities, recognizing that no allowances have been made for the Marshall Defendants' cases and matters which may be proven attributable to associates and that proven costs would be deductible from the "Revenue Amount" columns of all Defendants and could reduce those amounts:

## THE RAWLE DEFENDANTS

| PARTNER | PARTNERSHIP INTEREST | REVENUE AMOUNT | PARTNER'S SHARE | REIMBURSEMENT AMOUNT |
|---|---|---|---|---|
| Salmon | 11.03% | $492,892.30 | $54,366.02 | $438,526.28 |
| Springer | 6.58% | $470,710.31 | $30,972.74 | $439,737.57 |
| Neeson | 10.06% | $279,455.50 | $28,113.23 | $251,342.27 |

## HOLLENBACH

| PARTNER | PARTNERSHIP INTEREST | REVENUE AMOUNT | PARTNER'S SHARE | REIMBURSEMENT AMOUNT |
|---|---|---|---|---|
| Hollenbach | 3.23% | $ 30,502 | $ 985.21 | $ 29,516.79 |

## THE MARSHALL DEFENDANTS (COLLECTIVELY)

| PARTNER | PARTNERSHIP INTEREST | REVENUE AMOUNT | PARTNER'S SHARE | REIMBURSEMENT AMOUNT |
|---|---|---|---|---|
| Brennan | 5.36% | | | |
| Osorio | 5.14% | $749,096 | $95,135.19 | $653,960.81 |
| Kaczka | 2.2 % | | | |

## FOGELBERG

| PARTNER | PARTNERSHIP INTEREST | REVENUE AMOUNT | PARTNER'S SHARE | REIMBURSEMENT AMOUNT |
|---|---|---|---|---|
| Fogelberg | 3.21% | $342,461 | $10,993 | $331,468 |

We note that all Defendants will have the burden of proving any appropriate deductions from the "Revenue Amounts" stated. We also note that the Marshall Defendants will be obliged to provide the burden of proving what revenue was generated by nonpartners and by each of them except Brennan, whose bankruptcy filing stays the entry of any judgment against him. Otherwise, we will compute therein respective reimbursement amounts by dividing the total Marshall firm amount by the partnership interests in the Debtor of the nondebtor remaining Marshall Defendants.

### D. *CONCLUSION*

An order which is consistent with the conclusions which we have reached in this Opinion follows.

### *ORDER*

AND NOW, this 4th day of December, 1998, after a trial of this proceeding ("the Proceeding") on September 9, September 11, September 14, and September 17, 1998, and upon consideration of the parties' post-trial submissions, it is hereby ORDERED AND DECREED as follows:

1. Judgment is entered in part in favor of the Plaintiff, the OFFICIAL COMMITTEE OF UNSECURED CREDITORS ("the Committee") on Behalf of the Estate of Labrum & Doak, LLP ("the Debtor"), and against Defendants CARL R. FOGELBERG, BARBARA L. HOLLENBACH, THOMAS C. KACZKA, PETER J. NEESON, JOHN H. OSORIO, JOHN E. SALMON, and STEPHEN J. SPRINGER ("the Defendants").

2. It is DECLARED that the above-named Defendants are liable to the Debtor for the net profits obtained by them from non-contingency-fee cases and matters initiated during their partnership with the Debtor and personally taken over by them upon the Debtor's dissolution, for the period between August 1, 1997, and July 31, 1998.

3. The parties shall designate in writing to all other interested parties, counsel for the

Debtor and the Former Partners' Committee, and the court in chambers whether they wish to provide further evidence in support of their respective positions in the Proceeding in light of this Opinion and a brief description of that evidence on or before December 21, 1998.

4. A hearing to further consider any evidence designated by the parties in paragraph 3 *supra* is scheduled on

WEDNESDAY, JANUARY 6, 1999, AT 9:30 A.M. and shall be held in Bankruptcy Courtroom No. 1, Second Floor, 900 Market Street, Philadelphia, PA 19107.

5. The parties are encouraged to stipulate to the precise liability of any of the Defendants or, in the absence of any such agreements, to stipulate to additional documentary or other evidence which may be received at the aforesaid hearing.

6. The original copy of the designations required in paragraph 3 *supra* shall be filed with the Clerk of this Court and copies sent to opposing parties and delivered to the court on or before 4:30 P.M. on December 21, 1998, at the following address:

The Honorable David A. Scholl
Chief Bankruptcy Judge
900 Market Street, Suite 201
Philadelphia, PA 19107